# Paulling *v.* Creagh's Administrators.

# Creagh's Adm'rs *v.* Paulling.

*Bill in Equity to vacate and set aside Settlement of Accounts.*

1. *Accounts and settlements; when opened and re-examined in equity.*—Courts of equity will exercise their jurisdiction to open and re-examine an account stated or settlement made on the basis of it, for fraud, accident, imposition or mistake, with caution ; and will not grant relief except upon clear and precise allegations, supported by satisfactory proof.

2. *Same.*—When fraud or undue advantage is made to appear, infecting the whole account, the accounting will be entirely annulled, and the parties remitted to their rights as though no accounting had been made ; but where errors or mistakes only are shown; or the fraud or imposition does not stain

[Paulling v. Creagh's Adm'rs; Creagh's Adm'rs v. Paulling.]

all the items, the settlement will not be entirely vacated, but the party complaining will be allowed to surcharge and falsify it.

3. *Same; burden of proof.*—Fraud or imposition not being shown, but only errors and omissions, the correction is confined to errors and omissions in the account, and the burden of proof rests on the party complaining to establish them by satisfactory proof.

4. *Same; when not disturbed.*—Where an account, consisting of few and simple items, as to which complainant had knowledge or easy means of obtaining it, is stated and settled by giving independent security, the courts are much more reluctant to disturb it, than where the account is complicated and consists of many items, as to which complainant had not such particular means of knowledge; especially, where complaint of errors and mistakes is made for the first time, after the death of one of the parties.

5. *Same; what not sufficient to excuse laches.*—When an error complained of appears on the face of the account, the complainant will not be relieved from the imputation of laches and the presumption of knowledge of the error, upon a general allegation of ignorance of the mistake and failure to discover it until complaint made—no fact being shown which could reasonably have superinduced such ignorance, and no explanation being given of what quickened his diligence and caused the discovery afterwards.

6. *Interest on interest.*—As a mere incident, interest on interest is not allowed, but a promise to pay it is not illegal or without consideration; and the weight of authority is, perhaps, in favor of the validity of the promise, at law, whether made at or subsequent to the original contract.

7. *Same; rule in equity as to.*—In equity, however, such an agreement, made at the time of the original contract, will not be enforced; but where there is a settlement of accounts between the parties, or an agreement for that purpose, after the original debt has become due, or after the interest has fallen due, interest on interest will be allowed; and where a party, after the debt has fallen due, accepts an account with such computation of interest and gives his note for the balance thus ascertained, he must be deemed as assenting to such computation and promising to pay according to it.

9. *Indulgence or forbearance money, beyond legal interest; not recoverable.*—Where on closing account by notes, an amount is added, in excess of legal interest, for indulgence, equity will relieve against the debt to that extent; although the debtor repeatedly promised to pay it, and in an indorsement on the paper showing the transaction, enjoined its payment on his children and personal representatives, in event of his death—such agreement being plainly usurious.

9. *Costs; when taxed against party obtaining relief against usury.*—In this case, complainant, on bill filed against the administrators, sought to annul and re-state an account and settlement with the decedent, on the ground of fraud, imposition, mistake, and usury; and being entitled to relief only as to certain items of usury, as to which he neither informed the administrators, nor asked a correction before filing his bill, the court decreed that he should be taxed with the costs of the suit.

APPEAL from Chancery Court of Dallas.

Heard before Hon. CHARLES TURNER.

These are cross appeals from a decree of the chancery court of Dallas, in a cause wherein the appellant Paulling was complainant, and the administrators of A. M. Creagh, deceased, and F. S. Lyon, were respondents.

The original bill was filed in the chancery court of Wilcox on the 28th day of January, 1857, and was several times amended. On the 4th of November, 1868, a decree was rendered in the cause, from which Paulling took an appeal to this court, which reversed the decree, remanding the cause at

its June term, 1871. After this the cause was transferred, by agreement of counsel, to the chancery court of Dallas, which rendered the decree from which the present appeal was taken.

The material facts of the case, in the view which the court took of it, may be thus stated: In the year 1846, Paulling was indebted to the State Bank at Mobile for about $32,000, and this indebtedness had been classed "doubtful" by the legislature. Paulling, thereupon, entered into negotiations with F. S. Lyon, Esq., one of the commissioners to settle the affairs of the bank, for a settlement and adjustment of the debt, the bank having before this sold certain of Paulling's property, consisting of lands and slaves, under a deed of trust, this property being left in Paulling's hands by the agent of the bank. An arrangement was then effected by which it was agreed to release Paulling and reconvey the property purchased by the bank, upon his paying $25,000 in State bonds. There is a conflict, however, as to whether this was all that was covered by the agreement, and whether it did not include certain costs, and was not to expire by a given date if payment was not made by that time. Paulling not having complied with this arrangement, he entered into negotiations with Lyon a second time for a settlement of his indebtedness; and he and Lyon entered into another arrangement by which the debt was to be extended, upon Paulling's paying in two installments, by the 1st day of January, 1849, the amount agreed on and the costs, and confessing judgment for the property for which the bank was suing him, and which the commissioner would hold as security for Paulling's compliance with the contract. Paulling, however, averred that he was to confess judgment for his indebtednes, and did not know until long afterwards that judgment had been confessed for the property; he being very deaf and not distinctly hearing what was said, and failing to look at the records of the court, because of his confidence in Lyon, the commissioner.

After this a third negotiation was commenced, upon Paulling's informing the commissioner that he had induced A. M. Creagh to aid him in paying the debt. The three came to Montgomery in pursuance of this agreement, and a settlement was made in that city on the 17th of December, 1847, by which it was ascertained that Paulling owed the bank something "over thirty and under forty thousand dollars," and Creagh assumed Paulling's indebtedness, agreeing to pay $20,000 in State bonds in April following, and the balance due in State bonds by April 1st, 1849. Thereupon the judgment against Paulling, and his property purchased by the bank and for which the bank had obtained judgment, were

to be transferred to Creagh for his indemnity. Paulling also signed an agreement at the same time, that in consideration of being released from payment of the bank debt, he released his right to redeem the property and consented that Creagh should become the owner of the property, according to the terms of the above agreement. Paulling alleges that he did not read over either of these agreements, though they were read in his presence; he being very deaf, and having been told that it was a mere transfer of the bank's lien to Creagh. Creagh furnished the money with some aid from Paulling, and paid off the debt due the bank, which conveyed the property as agreed on in the Montgomery contract. After Creagh assumed the debt he told Paulling, as the latter alleges, that he need give himself no further uneasiness about the matter as he would keep the accounts, and Paulling having confidence in him paid little attention to the details of the transaction thereafter.

On the 10th day of June, 1852, Creagh called on Paulling for a settlement and payment of moneys advanced by him in the purchase of the State bonds, with which the bank debt was paid, having furnished Paulling an account of moneys advanced, showing the amount paid, the date of payment, and to whom payment was made, and an amount claimed for loss on 101 bales of cotton sold Paulling, all of which Creagh claimed as credits. Paulling was credited with the proceeds of certain cotton sold by Dickinson & Eustis and Boykin, McCrea & Foster. The account as made out showed on its face that annual rests were made in computing interest on the money advanced by Creagh. Paulling executed four promissory notes to Creagh for the amount due, upon the basis of the account furnished, and $1,000 additional was included in each note, as for indulgence, and Creagh agreed to sell to Paulling the property which the bank had conveyed to him on payment of Paulling's debt to the bank. The first of these notes was payable January 1st, 1853, and the others yearly thereafter.

After this, A. M. Creagh having died, M. W. Creagh and Willie S. Creagh became his administrators, and, in the early part of November, 1854, demanded security of Paulling for the debt. On the 11th day of November, 1854, Paulling met M. W. Creagh, by appointment, at his house. Here he met Lyon, and executed a deed of trust upon the property to secure the payment of the notes. This deed of trust recited the transactions of A. M. Creagh in assuming and paying Paulling's debt to the bank; the transfer of the judgment and conveyance of the property to Creagh, which the bank had recovered of Paulling; the execution of the notes by

Paulling to Creagh, and the agreement, on 10th June, 1852, to sell Paulling the property on payment of the notes, and provided that if Paulling did not pay one-half of the amount due on the 1st of January, 1856, the trustee might sell, &c.; and, also, if he failed to pay the balance on the 1st of January, 1857. Paulling alleged that he did not read over this deed, or hear it read over, as he was very deaf, and was told and supposed it was merely a transfer of the bank's lien on the property for the notes. After the execution of this deed, Paulling made payments on the notes, and the matter thus rested until January, 1857, when the trustee and administrators, having threatened to execute the power of sale in the deed of trust, Paulling filed his bill, praying an injunction to prevent the sale ; that the settlement with A. M. Creagh be opened and annulled, and for a statement of the account anew, and for general relief. The bill contains many charges that Lyon and A. M. Creagh contrived and colluded together to oppress complainant, and to exact from him, in the settlement with the bank, many items for which he was not liable ; that the price paid for the State bonds was less than Creagh charged in the account that the account, as made out, was usurious, and based on incorrect and erroneous calculation, failed to give him proper credits, and charged him with matters for which he was not liable. The bill states that complainant did not discover these errors at the time Creagh presented the account, and "never detected them until late in November, 1854, when, upon a subsequent examination, he detected gross errors to his prejudice."

The record is voluminous, and much testimony was taken on both sides relative to the transactions which the bill assails, but it is needless to set it forth in detail, as this court was of opinion that none of the charges of fraud or imposition were sustained, and many of them directly disproved.

The chancellor decreed that the complainant was entitled to a reference to state the account, and directed the register "to open the whole account, and state a new one, on the basis of a loan of money," &c., and to exclude, among other things, the $4,000 indulgence money.

On the coming of the report of the register, made on the basis of the decree, both parties filed exceptions to it. In the account, as stated by the register, the items of credit claimed for loss on 101 bales of cotton, and the four thousand dollars for indulgence money, were disallowed, and certain other items of credit for amounts paid on the purchase of State bonds were allowed, to the allowance of which the complainant filed exceptions. The court overruled these ex-

ceptions, confirmed the report, and decreed a foreclosure under the deed of trust for the amount thus ascertained.

On the appeal of Creagh's administrators, the decree directing the whole account to be opened, the rejection of the credit claimed for loss on the 101 bales of cotton, and the refusal to allow the $4,000 indulgence money, were assigned, among other things, for error. The bound transcript which came into the reporter's hands, does not contain the assignments of error on Paulling's appeal, but they are sufficiently indicated in the opinion.

Messrs. BROOKS, HARRALSON & ROY appeared for Creagh's administrators on their appeal, and for the appellees on Paulling's appeal.

Messrs. BRAGG & THORINGTON appeared for Paulling on his appeal, and for appellee on the appeal of Creagh's administrator's.

BRICKELL, C. J.—These are cross appeals from a decree rendered by the court of chancery, in a cause wherein the appellant, Paulling, was complainant, and the administrators of Alexander M. Creagh, deceased, and Francis S. Lyon, were respondents.

The object of the bill is to open and set aside a settlement of accounts had between Paulling and Alexander M. Creagh in his life, on allegations of fraud, imposition, errors, omissions and usury. There had been mutual dealings between him and Creagh, of which an account was rendered; he had full opportunity of examining, and full knowledge, or the means of acquiring it, of the correctness or incorrectness of the items composing the account. The account was closed by the execution of promissory notes for the balance claimed, and more than two years after executing them, and after Creagh's death, a deed of trust is executed to secure their payment.

This settlement is not conclusive on the complainant; does not estop him from being relieved in equity from any fraud or imposition which may have been practiced on him in making it; or from obtaining the correction of any errors or omissions which may be found to have entered into it. A court of equity has ample authority to open and re-examine an account stated, if there has been mistake, accident, fraud or undue advantage, by which the account is vitiated and the balance incorrectly fixed.—1 Story Eq. § 523. The jurisdiction is cautiously exercised ; only on clear and precise allegations, supported by proof, of fraud, undue advantage, acci-

dent or mistake.—1 Story Eq. §§ 523–27; 1 Dan. Ch. Pr. 371; *Langdon v. Roane*, 6 Ala. 527; *Cowan v. Jones*, 27 Ala. 325; *Drew v. Power*, 1 Sch. & Lef. 192. When fraud or undue advantage distinctly appears, infecting the whole account, the settlement will be annulled *in toto*, and the parties remitted to an accounting as if it had not been made.—*Barrows v. Rhinelander*, 1 Johns. Ch. 550; *Vernon v. Vaudry*, 2 Atkins, 119; *Wharton v. May*, 5 Ves. 27; *Farnam v. Brooks*, 9 Pick. 212; *Batizeur v. Wyman*, 1 McC. Ch. 161. When errors or mistakes only are shown, or when "the fraud or imposition is not shown to affect or stain all the items of the transaction," the settlement will not be vacated entirely, but the party complaining will be allowed to surcharge and falsify the account.—1 Story's Eq. § 523. If a confidential relation exists between the parties, or the one is by force of circumstances peculiarly subject to imposition from the other, the transactions will be closely and jealously scrutinized, and settlements had between them, whereby a balance is found due from the one reposing confidence or subject to imposition, will be more readily opened than a settlement between those dealing with each other at " arm's length."

When no fraud or imposition is shown, only errors or omissions, the court confines itself to the correction of these, and as to these the *onus probandi* rests on the party complaining of them.—*Pitt v. Chalmondely*, 2 Ves. sr. 565; 1 Story's Eq. § 525; *Langdon v. Roane*, supra; *Cowan v. Jones, supra.* As is said by the Master of the Rolls in *Brownell v. Brownell,* 2 Brown's Ch. 62, "the laboring oar is upon the party calling for the account." Or, as it was expressed by Chief Justice MARSHALL, "the whole labor of proof lies upon the party objecting to the account, and errors which he does not plainly establish can not be supposed to exist."—*Chappedelaine v. Dechenaux,* 4 Cranch, 309. In *Drew v. Power, supra,* it was said by Lord REDESDALE, "one rule material to observe in all cases of account is, that where there has been a settlement of accounts and either the account has been signed or a security taken on the footing of the account, a court of equity does not open that transaction and throw it again between the parties as if no such transaction had happened, unless the evidence which is produced (and that evidence founded on charges in the bill) shows the whole transaction to be so iniquitous that it ought not be brought forward at all to affect the party sought to be bound. If the account impeached be a settled account, or if an instrument has been executed on the foot of it, the court expects that the errors should be specified in the bill and proved as specified; otherwise it would be easy to overturn the fairest accounts and

those settled in the most solemn manner when there happens to be any complication in their nature." When an account is stated and settled by the giving an independent security, that security becomes *prima facie* a debt owing according to its terms. It can not be overturned on merely doubtful or probable testimony that errors intervened in the accounts which were settled, without imparting to all business transactions insecurity and uncertainty. In this case, the complainant produces the account he avers was rendered him by Creagh, and which was settled and closed by his execution to Creagh of four several promissory notes, for the security of the payment of which, after Creagh's death and more than two years after the settlement, he deliberately executed a deed of trust to the defendant Lyon. Near five years elapsed after the settlement and the giving of the notes, and more than two years after the execution of the deed of trust, before he makes any complaint of the settlement or of the incorrectness of the account. In the meantime he makes payments on the notes, and they have all become due and payable, and the deed of trust executed for their security subject to be closed.

The complainant was not of doubtful capacity, but of more than ordinary intelligence, experienced in business transactions, fully capable of detecting any errors or omissions which may have intervened in the settlement. The account was in his possession, doubtless often examined by him, and he had full opportunities of inquiring into its correctness in any and every respect. The items composing it are few, and all but three, relating to transactions immediately with the complainant of such recent date, that on the mere statement of them he knew whether they were correct or incorrect. Of the three items not relating to transactions with him, two are stated to be for money paid W. R. Hallett and one for money paid Branch Bank of Mobile. The complainant, by a simple inquiry of Hallett and of the Bank, could have ascertained whether these items were correct, if he had doubted their correctness. In all cases of this kind it is material to consider the character of the accounts, whether they are complicated, consist of various items, have been running for a long time, refer to matters of which the party found indebted could not have full knowledge ; when, as in this case, the account is simple, of but few items, in reference to which the party found indebted had full knowledge or every facility for obtaining it, there ought to be greater reluctance in disturbing a settlement, especially after the death of the party to be affected. If the law were otherwise, there could be but little reliance on settlements voluntarily and deliberately made.

The bill abounds with most serious allegations of fraud and imposition practiced on the complainant prior and subsequent to the settlement. It is not certain these frauds and impositions, if they existed, can be deemed to have affected the settlement. It is enough to say, however, in reference to these allegations that they are positively denied, and either directly disproved or are without a scintilla of evidence to sustain them. These allegations not being proved, no ground exists for setting aside the settlement and opening the account. The account must stand, subject to the correction of such errors and omissions as may be distinctly and clearly shown.

The first error complained of is, that in stating the account annual rests were made in computing interest on moneys by Creagh advanced to complainant, which it is insisted was grossly erroneous, unjust and usurious. This mode of computing interest is apparent on the face of the account, discoverable on a casual inspection of it. True, the complainant avers his ignorance of it, and that he did not discover it, nor any of the other errors or omissions of which he complains, until late in November, 1854. The allegation is very general, easily made, difficult of disproof, except by evidence of facts and circumstances, from which knowledge is inferrible. If the fact be as averred, the complainant should have gone farther and shown some fact which could have reasonably have superinduced his ignorance—what it was aroused his suspicions and quickened his diligence in examining and inquiring into the correctness of the accounts and the settlement. An allegation of ignorance of material facts, and of subsequent discovery, not thus specific and proved, can not be accepted to relieve from the imputation of laches, when laches is material; or to weaken the presumption of knowledge, when that is the legitimate inference from established facts.—*Fisher v. Boosly,* 1 Curt. 218; *Carr v. Hilton,* Ib. 390; *Stearnes v. Page,* 1 Story, 204, (S. C. 7 How. 829), *Farnum.v. Brooks,* 9 Pick. 212; *Martin v. Branch Bank Decatur,* 31 Ala. 115. Having this account in·his possession for more than two years after the settlement, with opportunity for its examination—the items being few, of recent date, and all such as the complainant either knew or had full opportunity of ascertaining to be correct, the admission of its correctness, express and implied, by the settlement, and the giving of the notes, can not be weakened by a mere general averment of ignorance and subsequent discovery of errors or omissions. When the complainant accepted the account, with .its computations of interest, and for a balance found due, increased by these computations, gave his promissory notes, it must

be taken that he assented to the mode in which the interest was computed and promised to pay according to it. If the agreement was usurious, or not supported by a consideration, it is not binding. As a mere incident, interest on interest is not allowed or recoverable. A promise to pay it is not however, usurious or illegal, or without consideration, and the weight of authority is, perhaps, in favor of the validity of the promise to pay it, at law, whether made at or subsequent to the original contract.—1 Am. Lead. Cases, 650. The claim to such interest is generally regarded by all the authorities as founded in justice, and a note or other security given for it, after it has accrued, will be sustained and enforced.— Ib. 561. Accounts may be legally settled on the basis of such interest, and an express promise to pay the balance is valid and binding.—Ib. In the case of *Eslava v. Lepetre*, 21 Ala. 530, it is said: "When interest has once accrued due, it becomes a debt. There is no longer, therefore, any objection to an agreement *inter partes*, that it shall be considered principal, and thenceforth carry interest."

In equity, an agreement made at the time of the original contract, to pay interest on interest, is discountenanced and will not be enforced, not because in itself it is usurious or illegal, but because it is deemed oppressive and tends to usury. "Interest upon interest," says Chancellor KENT, "promptly and incessantly accruing, would, as a general rule, become harsh and oppressive. Debt would accumulate with a rapidity beyond all ordinary calculation and endurance. Common business can not sustain such overwhelming accumulation. It would tend also to inflame the avarice and harden the heart of the creditor. Some allowance must be made for the indolence of mankind, and the casualties and delays incident to the best regulated industry; and the law is reasonable and humane, which gives to the debtor's infirmity or want of precise punctuality, some relief, in the same infirmity of the creditor. If the one does not pay his interest to the uttermost farthing, at the very moment it falls due, the other will equally fail to demand it with punctuality. He can, however, demand it and turn it into principal when he pleases; and we may safely leave this benefit to rest upon his own vigilance or his own indulgence."—*Connecticut v. Jackson*, 1 Johns. Ch. 17. In this case is clearly stated the rule, supported by authority, that when there is a settlement of accounts between parties, or an agreement for that purpose, after the original debt has become due, or after the interest has become due, interest on interest will be allowed in equity.—1 Am. Lead. Cases, 651. In the case of *Eslava v. Lepetre, supra*, while it was declared an agreement

between mortgagor and mortgagee, made cotemporaneously with the mortgage debt, that interest as it became due should be converted into principal, was oppressive and unjust as tending to usury, and would not be enforced in equity; yet, after interest had accrued and become a debt, a subsequent agreement converting it into principal, bearing interest, was valid and would be supported. The interest having run in arrear, rests were made in the mortgagee's account of arrears from time to time, and finally a general account of all arrears, made on the basis of such rests, was stated between the mortgagor and mortgagee, followed by an express promise and an independent security for its payment, which was supported in equity. It follows, there is no foundation for the complaint that the account stated between Paulling and Creagh is erroneous or unjust, or usurious, because of the mode in which the interest was computed. The interest had accrued, was a debt due, and could be as it was by the agreement of the parties, converted into principal, bearing interest.

The next item of the account averred to be erroneous and an improper charge against the complainant, is of $1,505.16, for loss on 101 bales of cotton. The inquiry is not, as seems to have been supposed in the court of chancery and as has been argued here, whether the respondents, by evidence independent and distinct from Paulling's repeated admissions of the correctness of the account, have shown this item is a proper charge. The "laboring oar" is on Paulling, by evidence of its incorrectness, to show that his admissions were inadvertent or founded in mistake. It is manifest there was a sale of cotton by Creagh to Paulling, but on what terms is not disclosed, further than by the statement in the eighteenth paragraph of the original bill, that it was at eight cents per pound. It also appears from the testimony of Marshall, that he received from Creagh 101 bales of cotton to be sold for account of complainant, which were sold and the proceeds of sale paid to Creagh—that the complainant made inquiries of him and obtained from his books the amount of the proceeds of sale Creagh had received. This whole matter was capable of full explanation by the complainant, if there be error in it. None has been given, which lessens the force of his repeated admissions of the correctness of this item and its rejection as a proper charge in the account was error.

The remaining items of the account, the correctness of which are disputed, consist of charges for moneys paid for "State bonds," and money paid the Branch Bank at Mobile, for the complainant. Independent of the admissions made by the complainant of the correctness of these items, there

is no room for doubt on the other evidence that they are just and proper. Nor has the complainant shown by satisfactory evidence he was entitled to any credit not included in the account.

A radical error pervading the interlocutory decrees and the final decree, was in opening and stating anew the account the parties settled. In the most favorable aspect of the case for the complainant, he was entitled only to surcharge and falsify the account. No fraud or imposition being shown, the whole right to relief, so far as the matters embraced in the account are involved, being dependent on proof made by the complainant of errors or omissions existing in it, the account should have been taken and established as a stated account. If an omission of credit was shown, it should have been added; or if an improper charge was found, it should have been deducted, leaving the account in all other respects intact.—1 Dan. Ch. Pr. § 6678. Into this error the court of chancery was induced, doubtless, by the opinion pronounced in this cause when it was here at a former term. From that opinion we are constrained to dissent. It does not seem to us supported by the evidence, or in accordance with well established legal principles. The statute (R. C. § 3510,) compels us to depart from it and to render judgment according to the law, as we believe it should have been originally declared. That opinion denies the settlement the parties had made—the complainant's acquiescence in it—his recognition of it, not only by payments on the notes, but by the deed of trust, which approaches very near, if it is not in fact, a confirmation of it, all force or validity. It seems the court regarded the parties as standing in relations of confidence— that Creagh was Paulling's trustee or agent, or confidential friend, to aid him in extrication from his pecuniary embarrassments. The confidence reposed, and that confidence was kept, was that Creagh would advance the money necessary to relieve the property of Paulling from the claim of the bank, and by indulgence enable him, if possible, to repay the money and retain the property. The relation was the ordinary one of debtor and creditor; the creditor having security for his debt. All the transactions, so far as found in the record, are free from the slightest trace of fraud or imposition, and we can scarcely conceive of a more dangerous precedent than that which would be established, if a settlement deliberately made, acquiesced in, recognized, standing for several years, should after the death of one of the parties, be opened and annulled without proof of actual fraud or imposition. Indeed the evidence, so far from proving or tending to prove fraud or imposition, impresses us with the conviction Creagh was

a lenient, indulgent creditor, becoming such at the solicita-
tion of the complainant, when others had refused to aid him,
and he was in peril for the want of pecuniary assistance, of
losing a large and valuable real and personal estate.  No
advantage was taken of the necessities of the complainant,
no effort to oppress him, or to hinder him in acquiring the
property he was anxious to save.  Security for the payment
of the debt, by the title of the property held by the bank,
was all that was required of him.  Such was certainly the
complainant's own view, long after the settlement, and when,
it is not too much to say, he either knew or was negligent in
not having full knowledge of all the matters now the subject
of complaint, and when free from all influence Creagh could
exert.  Not only his verbal declarations to some of the wit-
nesses, expressive of his gratitude to Creagh, but the indorse-
ment in writing made and signed by him on one of the mem-
oranda (now produced by him) used in the settlement, by
which he enjoins his personal representatives and his chil-
dren "faithfully to pay the debt," are conclusive evidence
such was his view.

We think it satisfactorily appears, that to each of the
notes executed by the complainant, was added the sum of
one thousand dollars, in excess of legal interest.  This is the
item of $4,000 stated, not in the account which was settled,
but in the memorandum last referred to, as for indulgence.
Being an excess of legal interest, though the complainant
voluntarily promised its payment, and repeated the promise,
and on the paper showing it, made the indorsement request-
ing his personal representatives and his children, in the event
of his death, to pay it, it is usurious and its recovery forbid-
den by the statute.  The complainant was entitled to its
deduction from the notes.  That deduction being made, the
notes must remain as valid debts, on which the complainant
is entitled to credits only for payments made after their exe-
cution.  On this basis the court should order an account
taken, and in taking such account the computations of inter-
est should be made according to the statute, and not accord-
ing to the mode prescribed in the former opinion.  For the
balance found due from the complainant, a decree should be
rendered in favor of the administrators of Creagh, and a sale
of such of the property embraced in the deed to Lyon as has
not perished, should be ordered for its payment.  The costs
should be taxed against the complainant.  The only relief to
which he is entitled, is from this item of usurious interest,
of which he gave the administrators no information, and did
not request or claim its deduction before filing his bill.

On the assignments of error by Paulling, the decree could

[Harwood, Adm'r, v. Harper et al.]

not be disturbed. But on the assignments by Creagh's administrators, the decree must be reversed and the cause remanded for proceedings in conformity to this opinion. The costs of each appeal must be taxed against Paulling.